IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL M. CORJASSO, III,

        Petitioner,             No. CIV S-97-0018 GEB GGH P

  vs.

ROBERT AYERS, JR., et al.,

        Respondents.        FINDINGS AND RECOMMENDATIONS

_____/

I.  Introduction

      Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1994 conviction for first degree murder with special allegations of personal use of a deadly weapon and murder committed during the course of a robbery.  Petitioner is serving a sentence of life without the possibility of parole.

      After carefully reviewing the record, the court recommends that the remaining claims be denied.

II.  Procedural Background

      Petitioner filed the original petition in pro per on January 6, 1997.  On June 19, 1997, the court appointed counsel to represent petitioner.  On January 27, 1999, petitioner filed a

1   second amended petition, which is the operative petition in this action.  The second amended

2   petition raises the following claims: 1) violation of Fifth and Fourteenth Amendments right to

3   due process by the appearance of a conflict due to a pre-existing and continuing client

4   relationship between the prosecutor and juror Hill; 2) ineffective assistance of counsel based on

5   counsel's failure to object to the continued presence on the jury of Ms. Hill; 3) ineffective

6   assistance of appellate counsel based on counsel's failure to identify the issues raised in claims 1

7   and 2; 4) denial of due process because testimony of prosecution witness Allen was tainted by

8   her involuntary confession; and 5) denial of due process and a fair trial because the testimony of

9   Allen was compelled by the use of a coercive immunity agreement.

10          On March 29, 1999, respondent filed a motion to dismiss on grounds that the

11   claims raised in the amended petition were barred by the statute of limitations.  On December 28,

12   1999, this court recommended that the motion to dismiss be granted.  On April 25, 2000, the

13   district court adopted these findings and recommendations and judgment was entered.

14          On February 26, 2002, the Ninth Circuit reversed judgment, finding that the

15   second amended petition was timely.  On May 31, 2002, respondent filed an answer to the

16   second amended petition.  On August 5, 2002, petitioner filed a traverse.

17          On March 7, 2003, petitioner filed a motion for partial summary judgment as to

18   claims 1, 2 and 3.  On August 19, 2003, this court recommended that petitioner's motion be

19   denied and that partial summary judgment be entered for respondents as to claims 1, 2 and 3.  On

20   September 24, 2003, the district court adopted these findings and recommendations.

21          On January 4, 2005, the Ninth Circuit reversed and remanded in part the

22   September 24, 2003, order.[1]  In particular, the Ninth Circuit upheld this court's order denying

23

---

24       [1] The undersigned is puzzled why the Ninth Circuit believed it had jurisdiction over this appeal.  The Findings and Recommendations provided that only three of the claims were at issue

25   in the parties' summary judgment proceedings, and that the remainder would be adjudicated later.  August 19, 2003 Findings and Recommendations at 17 and 17 (n.9).  Judge Burrell's order of adoption (September 24, 2003) ordered the entry of *partial* summary judgment in favor of

26   respondent.  No final judgment was ever entered.  No certification of an interlocutory appeal was

claim 1 but reversed this court's order denying claim 2.  The Ninth Circuit directed this court to

hold an evidentiary hearing as to this claim:

> There is a material dispute as to whether counsel consulted with Corjasso about allowing the juror who was represented by the prosecutor's law firm to serve. Indeed, the record is barren as to why counsel failed to challenge the juror when he was advised of the conflict and the purported statutory right to challenge. Despite Corjasso's request, the state court failed to hold an evidentiary hearing on the ineffectiveness claim.  He is now entitled to an evidentiary hearing in the district court to resolve the substantial issues of fact.

January 4, 2005, order by Ninth Circuit, p. 3.

On June 16, 2005, respondent filed a motion to dismiss on grounds that

petitioner's ineffective assistance of counsel claim was not exhausted.  On September 21, 2005,

the court recommended that this motion be denied.  On November 23, 2005, the district court

adopted these findings and recommendations.

On September 23, 2005, and November 7, 2005, an evidentiary hearing was held

regarding petitioner's ineffective assistance of counsel claim.  On December 7, 2005, petitioner

filed a post-hearing brief.  On January 5, 2006, respondent filed a post-hearing brief.

On January 24, 2006, petitioner filed a motion to stay this action pending the

exhaustion of new claims.  On March 9, 2006, this court recommended that petitioner's motion

be denied.  On June 6, 2006, the district court adopted these findings and recommendations.

Petitioner's claims 2 (ineffective assistance of counsel), 3 (to the extent it

challenges appellate counsel's failure to raise the ineffective assistance of counsel claim), 4 and 5

are now submitted for decision.

III. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

---

ever made.  Nevertheless, the remand  occurred and this court has followed the instructions.

1   AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

2   standards of review to be used by a federal habeas court in assessing a state court's adjudication

3   of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

4   (9th Cir. 1997).

5          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

6   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

7   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

8   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

9   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

10  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

11  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

12  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

13         "Unreasonable application" of established law, on the other hand, applies

14  mixed questions of law and fact, that is, the application of law to fact where there are no factually

15  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

16  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

17  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

18  deference is not blindly automatic, "the most important point is that an *unreasonable* application

19  of federal law is different from an incorrect application of law....[A] federal habeas court may not

20  issue the writ simply because that court concludes in its independent judgment that the relevant

21  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

22  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

23  1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

24  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

25  authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

26  \\\\\

1    The state courts need not have cited to federal authority, or even have indicated

2    awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

3    Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

4    contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

5    unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

6    occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

7    established Supreme Court authority reviewed must be a pronouncement on constitutional

8    principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

9    binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

10    However, where the state courts have not addressed the constitutional issue in

11    dispute in any reasoned opinion, the federal court will independently review the record in

12    adjudication of that issue.  "Independent review of the record is not de novo review of the

13    constitutional issue, but rather, the only method by which we can determine whether a silent state

14    court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

15    2003).

16    No state court held a hearing and found facts with respect to petitioner's

17    ineffective assistance of counsel and related appellate counsel claims.  Therefore, the ordinary

18    rule that state factual findings are presumed correct and can only be overcome by clear and

19    convincing evidence, see Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004), does not apply

20    here.  Rather the court engages in de novo fact finding.  Killian v. Poole, 282 F.3d 1204, 1207

21    (9th Cir. 2002).

22    The California Court of Appeal was the last state court to issue a reasoned opinion

23    addressing claims 4 and 5.  Answer, Exhibits A, B, C.  Accordingly, the court considers whether

24    the denial of these claims by the California Court of Appeal was an unreasonable application of

25    clearly established Supreme Court authority.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2

26    (9th Cir. 2000) (when reviewing a state court's summary denial of a claim, the court "looks

1  through" the summary disposition to the last reasoned decision).

2  IV. Claim 2: Ineffective Assistance of Counsel

3           A.  Standards for Ineffective Assistance of Counsel

4         The test for demonstrating ineffective assistance of counsel is set forth in

5  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

6  that, considering all the circumstances, counsel's performance fell below an objective standard of

7  reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

8  identify the acts or omissions that are alleged not to have been the result of reasonable

9  professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

10  whether in light of all the circumstances, the identified acts or omissions were outside the wide

11  range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that

12  counsel's conduct was within the wide range of reasonable assistance, and that he exercised

13  acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

14  695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

15         Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

16  693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

17  counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

18  694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

19  confidence in the outcome."  Id., 104 S. Ct. at 2068.  More will be said concerning what precisely

20  is the "proceeding" in which the court's confidence must be undermined.

21         The Supreme Court has recently emphasized the importance of giving deference

22  to trial counsel's decisions, especially in the AEDPA context:

23         In Strickland we said that "[j]udicial scrutiny of a counsel's
          performance must be highly deferential" and that "every effort

24         [must] be made to eliminate the distorting effects of hindsight, to
          reconstruct the circumstances of counsel's challenged conduct, and

25         to evaluate the conduct from counsel's perspective at the time."
          466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is

26         presented with an ineffective-assistance claim not subject to §

2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

B.  Factual Background

The court will set forth the factual background it first set forth in the August 19, 2003, findings and recommendations addressing petitioner's partial summary judgment motion.

The prosecutor, L. Eugene Rasmussen, appointed as a special prosecutor in petitioner's murder case, was also a partner in the law firm of Rollston, Henderson, Rasmussen & Crabb.  Juror Grace Hill (now deceased) and her husband Ernest Hill first became clients of the law firm of Rollston, Henderson, Rasmussen & Crabb in 1991.  See Joint Statement Regarding Discovery, Stipulated Facts filed February 6, 2003 (hereinafter "Joint Statement").  The law firm represented the Hills in a small claims case concerning a refund connected to the sale of a piece of property, and law partner Kenneth Rollston acted as the Hills' attorney.  Id.  On April 30, 1991, the Hills were billed $275 for legal services rendered, and this bill was paid on May 30, 1991.  A copy of the law firm billing records is attached to the Joint Statement as Exhibit 1.

Between December 1, 1992, and February, 1993, Grace Hall called the law firm concerning a question regarding burial plots.  Mr. Rollston spoke to Ms. Hill on January 8, 1993.  Ms. Hill was not billed for Mr. Rollston's services in connection with this matter.  Id.

In July, 1993, the Hills hired the law firm to represent them in a small claims matter regarding defects in a home that she had recently sold.  The Hills were represented in this

7

1   matter by Kenneth Rollston.

2   　　　　　Prior to the trial, Mr. Rasmussen circulated a venire list  to all of the attorneys at

3   the law firm.  Mr. Rollston vaguely remembers writing "may be former client" after Grace Hill's

4   name on the venire list circulated prior to the Corjasso trial.  See Joint Statement.

5   　　　　　Prior to Mr. Corjasso's trial, Grace Hill completed a written juror questionnaire.

6   In that questionnaire, Ms. Hill was asked if she had ever been a plaintiff or defendant in any type

7   of lawsuit and she responded, "Small claims – I won."  Ms. Hill was asked whether she knew

8   either L. Eugene Rasmussen or John T. Ward, the prosecutor and defense attorney respectively.

9   She responded, "No."  Ms. Hill signed the questionnaire under penalty of perjury.  Id.

10   　　　　　On May 25, 1994, during the voir dire in Mr. Corjasso's case, the prosecutor L.

11   Eugene Rasmussen informed the court that he believed that one potential juror, Grace Hill, had

12   been a client of his firm in the past.

13   　　　　　The trial court then asked:

14   　　　　　Also, one question that was not asked, unfortunately, which I
　　　　　should have asked, was is (sic) there anyone, any one of the
15   　　　　　prospective jurors who is a client of Mr. Rasmussen, of the firm
　　　　　that Mr. Rasmussen is with?  That's Ralston, Henderson and
16   　　　　　Rasmussen.  No one.
　　　　　Did you indicate, Mr. Rasmussen, you thought that Grace Hill
17   　　　　　might be a client?
　　　　　Mr. Rasmussen: I understood that Grace Hill at one point in time
18   　　　　　may have been a client.
　　　　　Ms. Hill: I'm not her.  No, I wasn't a client of yours, it was an
19   　　　　　associate of yours.
　　　　　The Court.  But they're not representing you now in any event?
20   　　　　　Okay.  Thank you very much.  We'll recess....

21   Petitioner's Evidentiary Hearing Exhibit 1 at 3.

22   　　　　　Mr. Corjasso's attorney was present at the time and did not object to Ms. Hill's

23   selection as a juror.

24   　　　　　Opening statements were given in Michael Corjasso's trial on June 6, 1994, and

25   the trial proceeded until the jury reached a verdict on June 17, 1994.  On June 10, 1994, during

26   the trial, juror Hill called the law firm and left a message for Kenneth Rollston regarding the

8

1   release of school records for her deceased father-in-law.  See Exhibit 3 to the Joint Statement.

2            Mr. Rollston recalls talking to Ms. Hill, but does not recall the substance of the

3   conversation.  According to the law firm billing records, the Hills were not billed for Mr.

4   Rollston's services.  See Exhibit 1 to the Joint Statement.

5            Mr. Rollston recalls discussing Ms. Hill's phone call with Mr. Rasmussen.  Id.  On

6   June 14, 1994, Mr. Rasmussen informed the trial judge that it had been brought to his attention

7   that Ms. Hill had contacted his partner at the law firm.

8            Ms. Hill was brought into the courtroom and questioned by the judge and Mr.

9   Rasmussen.

10           THE COURT: Counsel brought up an issue or a question about
             whether you had contacted the firm that Mr. Rasmussen is with?
11           JUROR HILL: That Mr. who is with?
             THE COURT: Rasmussen.
12           JUROR HILL: No.
             THE COURT: Mr. Rasmussen, did you --
13           MR. RASMUSSEN: Did you call Ken Ralston?
             JUROR HILL: Yes.
14           MR. RASMUSSEN: He's one of my partners.
             JUROR HILL: Right.
15           MR. RASMUSSEN: Did you call him this past week Thursday or Friday?
             JUROR HILL: Yes.
16           THE COURT: That was -- there's a problem with your being a
             client of the same firm that is prosecuting the case. That's what we
17           wanted to know about. What was the call about?
             JUROR HILL: I asked him how I go about getting a court order to
18           get some records for my deceased father-in-law who died in World
             War II.
19           THE COURT: Oh, I see. Is that an issue?
             JUROR HILL: School records in Hollister.
20           THE COURT: Oh, I see.
             JUROR HILL: My husband's been trying to get information on
21           him, so we've been trying to get information from different
             sources, and that was one of them.  Because I called Hollister, and
22           they said I needed a court order in order to get his school records.
             THE COURT: Okay. That's the kind of thing that creates a
23           problem because of a statute that says a juror can't be the client of
             the same attorney that's prosecuting the case, you see? I'm not sure
24           what we can do with that. Counsel, do you have any questions?
             MR. WARD: I just ask have you retained his services or were you
25           just asking a question about how to do something?
             JUROR HILL: I haven't had his services for about a year and a half.
26           MR. WARD: Okay. But I meant this past week when you

                                          9

1  contacted him, you weren't -- you didn't retain his services at that time?

2  JUROR HILL: No, it was just to call him to ask that question how to get a court order.

3  MR. WARD: Okay. And you have no intention of contacting him before the end of this trial again?

4  JUROR HILL: No, because I got the attorney's name who is the attorney for Hollister High School, and I'm working with her now.

5  MR. WARD: Okay. You didn't pay Mr. Ralston anything for the information he gave you?

6  JUROR HILL: No, it was just a phone call.

7  THE COURT: Okay. I'd appreciate it if you not contact that firm anymore until the trial's over with to avoid any appearance of impropriety.

8  JUROR HILL: When I contacted Mr. Ralston, I didn't even think about --

   THE COURT: I understand that.

9  JUROR HILL: -- him being associated with this because I wasn't even thinking of this.

10 THE COURT: Yeah, I understand that.

   JUROR HILL: It was a total separate issue.

11 THE COURT: Right.

   MR. RASMUSSEN: May I simply ask? Ms. Hill, do you feel that

12 you can continue as a fair and impartial juror in this case?

   JUROR HILL: Oh sure.

13

14 RT pp. 694-697.

15     No objections were made by either attorney to Ms. Hill remaining on the jury.

16 Ms. Hill participated in reaching a guilty verdict in Corjasso's trial.

17     C. Analysis

18     Petitioner's second claim alleges that his trial counsel provided ineffective

19 assistance by failing to: (1) object to the continued presence of Ms. Hill on the jury, (2) move for

20 a mistrial and (3) investigate the circumstances of the juror's contacts with Mr. Rasmussen's

21 firm.

22     In the August 19, 2003, findings and recommendations, this court found that

23 petitioner had not demonstrated prejudice as a result of counsel's alleged ineffectiveness.  In

24 making this finding, the court relied on its discussion of claim 1, where it found that the presence

25 of Juror Hill was not prejudicial in the due process sense.  Based on this finding, the court found

26 that it need not resolve the conflicting accounts of counsel's decision to keep Ms. Hill on the jury

10

contained in the declarations of trial counsel John Ward and petitioner.

In the order remanding this issue for an evidentiary hearing, the Ninth Circuit directed this court to hold an evidentiary hearing addressing the reasonableness prong of the Strickland analysis, i.e. (1) whether counsel consulted with petitioner regarding his decision to keep Hill on the jury and (2) why he made that decision.  Although the Ninth Circuit did not address this court's discussion regarding the prejudice prong, it implicitly adopted this reasoning by noting that "[t]he juror's relationship with the firm was far from substantial."  116 Fed. Appx. 847, 848 (n.2).  In discussing the prejudice prong, the undersigned will repeat, albeit in a more expansive way, the previous discussion herein as he believes it to be as correct now as it was then.  Of course, no viable ineffective assistance of counsel can exist if petitioner fails to satisfy the standards of either prong.

1. Reasonableness

*Did Ward Consult with Petitioner Regarding Retaining Hill on the Jury*

The Ninth Circuit has found, at least in this case, that petitioner had a constitutional or other legal right to be consulted upon his attorney's voir dire decisions.  The court will first address the factual issue of whether Ward consulted with petitioner.

As indicated above, the issue of Hill's relationship with Rasmussen's firm was discussed twice during trial.  During voir dire, Hill told the court that she was not a client of Rasmussen's but had been a client of Rasmussen's associate.  Ward did not object to her presence on the jury at the time. The second time this issue arose was during trial when Rasmussen informed the court that Hill had contacted his partner.  Hill was questioned in the courtroom regarding this call.

The declarations submitted by petitioner and Ward prior to the evidentiary hearing contain information addressing the consultation issue.  In his declaration dated October 8, 2002, attached to the March 26, 2003, opposition to petitioner's summary judgment motion, trial counsel Ward stated that petitioner consented to having Hill stay on the jury and that he

determined that Hill would be fair and impartial:[2]

> I recall that during voir dire of the prospective jurors, one of the jurors, Ms. Hill, explained that she had previously used the services of Mr. Rasmussen's law firm. My recollection is that she said that she had worked with a lawyer other than Mr. Rasmussen.
>
> During the trial the matter was revisited when it came to light that the juror had called Mr. Rasmussen's law firm inquiring about a personal matter for her husband. She was not seeking representation but merely had a question. I recall that after speaking with the juror in the presence of the court and Mr. Rasmussen, I was satisfied that the juror had not had any dealings with Mr. Rasmussen personally, and was also satisfied that she could remain fair and impartial.
>
> I also recall that I spoke with Mr. Rasmussen about the matter off the record, and he assured me that he had no personal relationship with the juror, and did not know her or anything about her other than that she may have been a client of one of his partners or associates.
>
> I spoke to my client, Mr. Corjasso, about the matter during trial, and specifically discussed the possibility of removing Ms. Hill from the jury. Mr. Corjasso expressed a desire to keep Ms. Hill on the jury. Mr. Corjasso believed that he would benefit from the presence of women on the jury.
>
> Based on Mr. Corjasso's desires, and my own determination that the juror could be fair and impartial, I consented to having her remain on the jury.

In his declaration dated April 4, 2003, attached to his April 4, 2003, reply to respondent's opposition to his summary judgment motion, petitioner stated that he and Ward never discussed the issue of having women versus men on the jury. Petitioner also stated that Ward did not discuss with him the issue of whether Hill should stay on the jury. Petitioner reiterated his declaration testimony in his in-court testimony. RT 18, 20, 21, 22, 23, 24, 30-31, 32.

At the evidentiary hearing, Ward testified that he could not remember discussing anything with petitioner regarding Hill per se. RT at 76. At the time he executed his declaration in 2002, when he stated that he discussed this issue with petitioner, Ward's memory was better. Id. at 77. Ward testified that normally he would discuss with a client an issue of a potential

---

[2] This declaration was part of the record before the Ninth Circuit in the prior appeal but was apparently overlooked.

1    juror's partiality.  Id. at 79.

2          At the evidentiary hearing, Ward testified that when the court decided to hold a

3    hearing regarding Hill's contact with Rasmussen's firm during the trial, Ward did not ask for a

4    recess to discuss the issue with petitioner.  Oct. 4, 2005, RT at 19.  Ward testified that because the

5    majority of conversations with the client during trial are not on the record, it is difficult to tell

6    from the transcript the extent of conversations he had with his client.  Id., at 53.

7          Ward testified that he believed that having older women on the jury would benefit

8    petitioner because the key prosecution witness, Randi Allen, was a young woman, and older

9    women tended to judge younger women more harshly.  RT at 73.  Ward testified that he

10   discussed this with petitioner before the trial began.  Id.  Ward recalled that when they discussed

11   the issue of keeping women on the jury petitioner stated, "That's good; women like me."  Id., at

12   111.

13         To summarize the evidence, petitioner denies ever speaking with Ward regarding

14   Hill's continued presence on the jury or the issue of women versus men on the jury.  In contrast,

15   Ward's declaration states that during the trial he and petitioner discussed the issue of Hill's

16   continued presence on the jury.  It is unclear from this statement whether Ward discussed this

17   issue with petitioner on both occasions that the issue came up, i.e. during voir dire and the actual

18   trial.  At the evidentiary hearing, Ward could not recall discussing anything with petitioner

19   regarding Hill.  Ward remembered discussing the issue of having older women on the jury with

20   petitioner prior to the trial.

21         After reviewing the record, the court finds that Ward and petitioner discussed[3] the

22   issue of Hill's continued presence on the jury.  The court also finds that Ward and petitioner

23   discussed prior to trial the fact that it would benefit petitioner to have women on the jury.  The

24   ───────────────

25   [3] By "discussed," the undersigned does not mean to infer that a lengthy conversation took place.  The time for such a conversation would not normally exist in the course of a trial.  However, the undersigned  finds that there was short, off-the-record comment or two on the issue

26   of Juror Hill.

1   undersigned discusses Ward's credibility at length below.

2          The court's finding does not mean that petitioner was totally incredible in his

3   testimony.  Indeed, there was nothing particularly incredible about what he said, or in the way in

4   which it was said.  Nevertheless, recollections may differ, and the court has chosen what it

5   believes to be the more credible, accurate testimony.  Moreover, petitioner believes that he has

6   much to gain in a court finding that he was not consulted on the matter of Juror Hill.  This

7   potential for biased, extra record "recollection" is a factor in the court's analysis.

8                    *Why Ward Failed to Challenge Hill*

9          Following the evidentiary hearing, the court finds that Ward did not challenge

10  Hill's continued presence on the jury for two reasons.  First, he determined that Hill was

11  sufficiently impartial because she did not know Rasmussen and her relationship with his firm was

12  de minimis.  Because she did not know Rasmussen, Ward did not think that she would favor the

13  prosecutor's side.  Second, Ward also determined that the juror who would replace Hill was

14  potentially less favorable.  The court will summarize the evidence on which it bases these findings

15  below.

16          In his declaration, Ward stated that he spoke with Rasmussen off the record

17  regarding Hill and he (Rasmussen) did not know anything about her other than that she had been a

18  client of one of his associates.

19          At the evidentiary hearing, Ward testified that he would have been uncomfortable

20  if a juror called Rasmussen or his firm specifically because Rasmussen was at the firm.  Id. at 28.

21  However, he had no information that led him to believe that Hill knew Rasmussen.  Id.

22          Ward testified regarding Hill's impartiality:

23          I don't know.  That's hard to answer.  This situation is not in the nature of a juror
            seeking the advice of the district attorney, who is generally the enemy.  No offense.
24          But an association with a private law firm was something different.  And while I
            may agree with Mr. Broderick and the judge that, potentially, there can be created
25          the appearance of impropriety, whether it actually creates the fact of impropriety, I
            think I certainly can't judge from reading transcripts.  I mean, it was important to
26          me to know whether or not she favored Gene Rasmussen, as a person, and

1  therefore, would have–have favored his side; or whether or not she had an on-
   going relationship with this firm such that, had she voted to acquit Mr Corjasso,
2  she would have been embarrassed to go back to that firm and say, "I voted not
   guilty on a jury that one of your partners tried."  That wasn't the case that I–that
3  existed at the time.

4  Id. at 64.

5          Ward testified that if he believed that Hill was trying to conceal the fact that she

6  had been a client of Rasmussen's firm, he would have been suspicious.  Id. at 101.  However,

7  "[i]n the context of everything that happened and all the discussions that we had about Ms. Hill's

8  association with the firm, it was very tenuous."  Id., at 101-102.  He further testified,

9          And I'm not even sure that her association with the firm occurred while he was
          actually a partner in the firm.  My impression was, and as I recall, she had
10         contacted an attorney in the firm for–I believe it was some small matter, may have
          been a will or something.  It was a piece of civil business that had been concluded.
11         She had no contact with Mr. Rasmussen, he had no contact with her, but it–but the
          relationship, the attorney/client relationship had been concluded.  And I don't
12         recall today that she ever tried to conceal that she had contacted that firm.

13  Id. at 102.

14          Ward testified that his decision regarding whether to challenge her for cause would

15  be based, in part, on who the replacement juror would be.  Id. at 29.  Ward testified that his

16  recollection was that the person who would have replaced Hill was not someone he particularly

17  wanted.  Id., p. 45.

18          Ward's decision not to challenge Hill on grounds that she did not know

19  Rasmussen, her relationship to his firm was tenuous, and because the replacement juror was not

20  someone he wanted was reasonable.  It is true that Ward testified that during voir dire he was not

21  aware that Hill had used the firm on several occasions prior to the trial.  September 23, RT at

22  104.  Ward testified that had he known that, he would have wanted to know more about her

23  relationship with the firm.  Id.  However, it is clear that Ward was properly focused on Hill's state

24  of mind, i.e., whether she believed she could be impartial based on her previous relationship with

25  Rasmussen's firm.  Hill, a non-lawyer, was in all probability not familiar with the legal doctrine

26  that a conflict of one is imputed to another, and Ward was not required to ascribe knowledge of

15

1  this doctrine to her in determining her impartiality.

2      The reasons concerning Ward's determination not to challenge Juror Hill were

3  reasonable strategic decisions.  By this finding, the court does not make a finding that Ward was

4  absolutely correct, or that other lawyers might not have made different determinations.  However,

5  the court does find that Ward had a sufficient factual basis to make the determinations he did, and

6  that his determination was not unreasonable.

7              *Ward's Credibility*

8      As indicated above, the court found Ward to be a sufficiently credible witness.  In

9  his post-hearing brief, petitioner spends several pages attacking Ward's credibility on a variety of

10  grounds.  Post-Hearing Brief, pp. 7-11.  Some of these attacks are based on minor discrepancies in

11  Ward's testimony or other situations which arose from which petitioner attempts to stretch an

12  inference helpful to the point at issue here.  The court will address some of these attacks below.

13      Petitioner first argues that even if he told Ward that he believed that he would

14  benefit from the presence of women on the jury, Hill would have been replaced by another

15  woman.  Petitioner argues that this fact undermines Ward's "self serving" declaration that

16  petitioner stated that he wanted women on the jury.

17      As discussed above, at the evidentiary hearing, Ward testified that he remembered

18  that he was not very comfortable with the woman who would have replaced Hill.  Oct. 4, 2005,

19  RT at 45.[4]  Based on this testimony, the court does not find the fact that the juror who would have

20  replaced Hill was a woman undermines Ward's credibility.  The court also observes that this juror

21  was 37 years old at the time of petitioner's trial.  Id. at 10.  Therefore, from Ward's perspective,

22  Hill was the more desirable female juror as she was older.

23

24          [4]  Generally, lawyers do not know who will be "next in the box" if a juror is excused.
     However, that is not always the case.  In the undersigned's courtroom, for example, the entire
25  selection order of potential jurors is determined ahead of time by the computer on a random
     basis.  For some reason that was essentially unchallenged by petitioner, Ward knew of the
26  identity of the next juror to be called.

1        Petitioner challenges Ward's credibility on grounds that Ward did not obtain

2  petitioner's permission to reveal attorney/client communications before signing his declaration,

3  nor did he seek permission from petitioner's present counsel.  While this may be true, petitioner

4  waived his right to attorney/client privilege when he raised his ineffective assistance of counsel

5  claim.  <u>Bittaker v. Woodford</u>, 331 F.3d 715, 716 (9th Cir. 2003) (en banc).  Ward's failure to

6  obtain permission from petitioner or his counsel to execute his declaration does not undermine his

7  credibility.

8        Petitioner challenges Ward's credibility by arguing that issues surrounding another

9  juror, Heidi Geroux, were far more serious.  Petitioner argues that this failure reveals more about

10  Ward's self-serving concerns rather than actual solicitude with respect to his client.  The issue of

11  juror Geroux came up at the evidentiary hearing, and petitioner sought permission to stay this

12  action so that he could return to state court and exhaust claims regarding this juror.  As discussed

13  above, this request was denied.  At the evidentiary hearing, evidence was presented that juror

14  Geroux sent the trial court a note expressing concern that petitioner had access to the jury

15  questionnaires which contained personal information regarding the potential jurors.  Oct. 4, 2005,

16  RT at 11.  Petitioner argues that because this note indicates that Geroux could not have been

17  impartial, and that Ward failed to inform him of this note, the common scenario supports his

18  claims regarding juror Hill.

19        The trial court held a brief hearing with juror Geroux to discuss the concerns raised

20  in her note:

21        Court: Court is convened in chambers.  You're Heidi Geroux?

22        Geroux: Yes.

23        Court: With juror number 11 Heidi Geroux and counsel, and, Mr. Ward, you waive
          the presence of your client?

24

        Ward: Yes, Your Honor.

25

26        Court: We have this note from you asking about the defendant in a murder case
          being able to see the jury memorandum or questionnaire.  Particularly with regard

1    to personal information, and I've discussed this with counsel.  Mr. Ward, as a
     matter of practice, does not let his clients see the questionnaire, so his client does
2    not have personal information about yourself such as your address and that sort of
     thing.  I think that was your concern, wasn't it?
3
     Geroux: Yes, and I saw him handling them, and going through them during the
4    jury selection process.

5    Ward: He wasn't reading–I would point out specific answers to him, not your
     personal information.  He doesn't get to see, but they would be specific answers.
6    For example, I think there was a juror who had a relative who had been murdered.

7    Geroux: Uh-huh, certainly, I understand.

8    Ward: And I would point out things of that nature, but all items of personal
     information relating to where you live or what your family does or anything else is
9    not available to them.

10   Geroux: Good, that makes me feel better.  However, I did see them in his hands,
     and right there on the very front page is name, address.
11
     Ward: But–I know, but that's the page I take off.
12
     Geroux: Oh, super.  I have no problem.
13
     Ward: When I review them I take off that front page, and then we're free to review
14   the rest of the material because nothing other than what's on that front page really
     identifies as personal to you that I can think of.
15
     Geroux: I can't either so that makes me feel good.
16
     Court: Okay.  Thank you very much.
17
     Geroux:  Thank you.  I didn't know quite how to address this.
18
     Ward: This is the proper way.  I wouldn't want you sitting there for two weeks
19   getting worried.

20   Geroux: Right.

21   Court: Thank you.

22   Geroux: Thank you.

23   RT 237-238.

24          While the transcript does not reveal whether Ward discussed juror Geroux's

25   concerns with petitioner, it reveals that Geroux was no longer worried after Ward reassured her

26   regarding petitioner's access to her personal information.  Every trial lawyer knows that not every

                                              18

1   quickly resolved problem which pops up in a trial need be discussed with the client.  Therefore, it

2   is not reasonable to infer from the Geroux transcript quoted above that Ward failed to consult with

3   petitioner regarding juror Hill or otherwise failed to adequately evaluate Hill's impartiality.

4          Petitioner challenges Ward's credibility by arguing that while Ward told the

5   superior court judge that he did not give juror information to defendant, he clearly did.  At the

6   evidentiary hearing, petitioner testified that Ward gave him access to the entire questionnaires,

7   including address and telephone numbers.  Sept. 23, 2005, transcript, p. 5-6.

8          Petitioner's testimony that Ward gave him access to the entire juror questionnaires

9   contradicts Ward's statement to juror Geroux that petitioner did not have access to the portion of

10  the questionnaires containing their names and addresses.  The court finds it unlikely that Ward

11  gave petitioner access to the personal identifying information of jurors.  At the evidentiary

12  hearing, Ward testified that when dealing with a juror who had a question regarding what the

13  defense may do with their, i.e. the juror's personal information, he would not lie to them.  Oct. 4,

14  2005, RT at 50.  For these reasons, the court finds that Ward did not give petitioner access to the

15  personal information of jurors.

16         Petitioner challenges Ward's credibility by arguing that in his initial declaration,

17  Ward made no mention of his desire to keep older women on the jury.  Petitioner suggests that

18  Ward made this up to bolster his own credibility.  At the evidentiary hearing, Ward explained how

19  he remembered this trial strategy after he executed his declaration:

20         Q: And so on that declaration you said, "women."  Did you have any discussion at
           any time with Mr. Whalen about the phrase "older women" or the use of that term
21         "older" prior to court today?

22         A: We had a discussion outside the courtroom this morning, yeah.

23         Q: And what was that?

24         A: Specifically, I can't remember all of it, but with respect to this issue, I
           volunteered to him that–and I had remember this within the last–I don't know,
25         month or two that I've been aware that I'd be coming down here to testify.  I re–I
           hadn't thought about Randi.  I hadn't thought about the trial that much.  I mean, I
26         was really focusing more on what I thought about it, of this issue with Juror Hill.

1            And then I started thinking just generally about the trial as a whole, and I
remember that Randi was the critical element in this.  And I remembered
2            conversations that we had had about the type of jurors that–

3 Sept. 23, 2005, transcript, p. 109.

4            Ward's explanation of when he remembered wanting older women jurors is

5 reasonable.  His failure to include this information in his declaration does not undermine his

6 credibility.

7            Petitioner argues that Ward is not credible because he testified at the evidentiary

8 hearing that he wanted older women jurors, i.e. women over 50.  Petitioner argues that

9 at the time of petitioner's trial, Geroux was 43 years old.  Oct. 4, 2005, transcript, p. 17.

10 Petitioner offers no information regarding the juror who would have replaced Geroux.  The very

11 fact that Ward allowed a 43 year old woman to stay on the jury does not undermine his credibility.

12            Petitioner next argues that Ward is not credible because in his declaration he states

13 that he made his own determination that Hill could be fair and impartial, yet he made no inquiry

14 except to hear from the prosecutor that he had no personal relationship with Hill.  Oftentimes in

15 the legal profession, especially in small communities, lawyers can often trust what is told to them

16 by fellow lawyers.  Indeed, that is what civility in law practice is all about, and that civility is a

17 goal often discussed.  Petitioner takes the position that Ward should have assumed that

18 Rasmussen would not tell him the truth, and that further inquiry was mandated.  The undersigned

19 disagrees.  Indeed, it would be quite a statement by the court against the legal profession if the

20 court were to find that one's opposing attorneys are to be presumed untrustworthy.  Moreover, as

21 discussed in the section above setting forth the factual background, the court held a hearing when

22 it was revealed that Hill had called the prosecutor's law firm during the trial.  RT at 694-697.

23 During this hearing, Ward questioned Hill regarding her contact with the law firm.  At the

24 conclusion of the hearing, the prosecutor asked Hill if she could continue to be a fair and impartial

25 juror.  RT at 697.  Hill responded, "Oh, sure."  RT at 697.  Because the issue of Hill's relationship

26 with the firm and ability to be impartial was addressed at this hearing, petitioner's challenges to

1    Ward's credibility on grounds that he based his evaluation of Hill's impartiality solely on the

2    prosecutor's statement to him that he had no personal relationship with Hill is without merit.

3           In sum, the court rejects the attacks on Ward's credibility.  Ward could have easily

4    testified in complete conformance with his declaration, and no one probably would have been the

5    wiser.  However, Ward did not take this easy way out when asked at hearing whether he

6    specifically remembered now whether he talked with petitioner about Juror Hill.  He simply

7    testified to what he remembered about the trial, and relied on his previous declaration to relate the

8    rest of the story.   The undersigned closely watched Ward on the stand and did not get the

9    impression that Ward was tailoring his testimony in order to avoid an embarrassing attack on his

10   handling of the trial.

11          2. Prejudice

12          Perhaps, trial counsel have a duty to consult with their client about voir dire tactics.

13   See ABA Defense Function Standard 4-5.2(b)(1992): decisions regarding trial tactics and strategy,

14   such as which jurors to strike, are the exclusive province of the attorney after consultation with

15   the client.  However, the Ninth Circuit has expressly held that if trial counsel has made a strategic

16   decision regarding tactics in voir dire, the "failure" of trial counsel to abide by his client's wishes

17   is not ineffective representation.  Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980).  If

18   counsel may reject a client's advice, one can validly wonder what the possible prejudice would be

19   in failing to consult.  Petitioner seemingly argues that the failure to consult must be some type of

20   structural error, i.e., per se prejudicial, constitutional error, because petitioner factually

21   demonstrates absolutely no reason why his client would have had some special insight into

22   whether Juror Hill should have been challenged .  No law exists for such a proposition, much less

23   established Supreme Court authority.  Nor, as seen above, can a client's mere disagreement with

24   his attorney on such an issue of strategy amount to any type of cognizable error.  Thus, the only

25   prejudice to be discussed, assuming for the moment that counsel acted unreasonably, is whether

26   the decision made by petitioner's counsel prejudiced (undermined confidence) in the outcome of

21

1  the "proceeding."

2        Little case law exists applying the <u>Strickland</u> paradigm in a jury selection situation.

3  <u>Fields v. Calderon,</u> 309 F. 3d 1095 (9th Cir. 2002) involved a claim of attorney ineffectiveness in

4  not asking sufficient questions on voir dire and juror bias.  Aside from the bias issue, the Ninth

5  Circuit quoted the <u>Strickland</u> standards and concluded: "we cannot say that failure to inquire

6  outside the court's voir dire was outside the range of reasonable strategic choice *or that it would*

7  *have affected the outcome*."  <u>Id</u>. at 1108 (emphasis added).  It is somewhat difficult to determine

8  what the Ninth Circuit meant by outcome – "outcome" of that one juror's selection regardless of

9  found bias; "outcome" of whether a biased jury member was present; "outcome" of the trial as a

10  whole.  <u>Fields</u> did find, insofar as juror bias was concerned, that the matter of reasonableness and

11  prejudice would depend much on the same factual determinations.  If so, the Ninth Circuit is

12  opting for the middle choice – the "outcome" is whether a biased juror made his or her way to jury

13  deliberations.  The undersigned believes that such is the correct choice.

14        The middle choice is also supported by out-of-circuit authority.  In <u>Hale v. Gibson</u>,

15  227 F.3d 1298 (10th Cir. 2000), the defense attorney was accused of ineffectiveness on account of

16  not challenging jurors "who had preconceived notions of Hale's guilt."  <u>Id</u>. At 1319.  The Tenth

17  Circuit held that the legal standard by which to judge prejudice in this context meant:

18      "To show a juror was biased, a defendant must show that the juror had such a
    fixed opinion that he or she could not judge impartially. [citation omitted].  Thus a

19      juror is not shown to be impartial simply because he or she had a preconceived
    notion as to the guilt or innocence of the accused.... Hale must show...that the juror

20      had such a fixed opinion that he or she could not judge impartially."

21  <u>Id</u>.

22        The prejudice definition here in its proper context would be a slight twist of the

23  above <u>Hale</u> discussion – that Juror Hill was so affected (biased) by her relationship with the

24  prosecutor's law firm that she could not judge impartially.  Moreover, when one speaks of "bias,"

25  one must define that term as the Supreme Court has "clearly established" it.  In order to be

26  "clearly established," the rule must be based on Supreme Court holdings and not dicta.  <u>Carey v.</u>

22

1   Musladin, __U.S.__, 127 S. Ct. 649, 653 (2006).

2          First, initially excluding any allegations of juror lying, the court examines Juror

3   Hill's rather de minimis relationship per se with the prosecutor's law firm.  Such a relationship, in

4   and of itself, raises an issue of implied bias, if it raises an issue of bias at all.  Actual bias is shown

5   when the juror explicitly concedes a bias, e.g., I can't be fair because I don't like defendants with

6   red hair, or the inference of bias is so unmistakable or unavoidable that a challenge for cause

7   would be sustained based on the record.  McDonough Power Equip. v. Greenwood, 464 U.S. 548,

8   554 104 S. Ct. 845, 849 (1984) ("demonstrated bias in responses to questions,") and id. at 464

9   U.S. 556-57, 104 S. Ct. 850, Blackman J., concurring (differentiating record bias from inferred

10  bias).  Even petitioner recognizes that under California law at the time, a juror who had a

11  relationship with the "person on whose complaint the prosecution was initiated" was placed into a

12  category of "implied bias."  Traverse at 7 note 2.  Analogous juror "relationship" cases either with

13  court personnel or witnesses fit into an implied bias category.  See Tinsley v. Borg, 895 F.2d 520

14  (9th Cir. 1990) (psychiatric social worker who had counseled victims of rape – the crime at issue);

15  United States v. Bradshaw, 787 F.2d 1385, 1390 (10th Cir. 1986) (juror knew government

16  witness); United States v. Allred, 867 F.2d 856, 870 (5th Cir. 1989) (juror had social contact with

17  agent of investigating agency); United States v. O'Neill, 767 F.2d 780, 784-85 (11th Cir. 1985)

18  (juror friendship in general with narcotics officers – in drug case).  Thus, the only type of claim

19  involved here insofar as the court is focusing on the relationship of the juror to the prosecutor's

20  law firm per se is the so called doctrine of "implied bias."

21          The Supreme Court has never explicitly adopted or rejected the doctrine of implied

22  bias.  This characterization of Supreme Court case law was observed in Solis v. Cockrell, 342

23  F.3d 392, 395 (5th Cir. 2003).  See also, Fields v. Woodford, 309 F.3d 1095, 1104 (9th Cir. 2002)

24  amended on other grounds 315 F.3d 1062 (9th Cir. 2002) (again referencing the fact that the

25  Supreme Court has never explicitly approved of a doctrine of implied bias).  If this is so, the claim

26  of implied juror bias in this AEDPA case (Solis adjudicated a pre-AEDPA case) is at an end

23

1   because there is no clearly established law on the subject.

2           Both of the above courts, however, recognized that several justices at times have

3   stated that the Supreme Court has *implicitly* recognized the doctrine.  In Smith v. Phillips, 455

4   U.S. 209, 221-224, 102 S. Ct. 940, 948-49 (1982), Justice O'Connor J. concurring, stated that no

5   previous Supreme Court precluded the use of an implied bias analysis.  Fields, 309 F.3d at 1104,

6   recognized that the Supreme Court "seem[ed] to embrace" the doctrine.  However, if the court is

7   not simply to make up meanings for words at odds with their plain sense, AEDPA's requirement

8   that in order to be actionable, a claim must have been the subject of "*clearly* established Federal

9   law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), cannot be

10  met in this case.  All courts agree that the Supreme Court has not explicitly held on the issue of

11  implied bias (the only possible bias here); an implicit  recognition of the implied bias doctrine will

12  not suffice as a holding.

13          Even if this court were to deem an implicit recognition of implied bias as clearly

14  established Supreme Court law, petitioner's argument would fail in this case.  One could postulate

15  that if a juror had been represented by a law firm in a serious matter, that juror, sitting in a

16  criminal case, might be more willing to accept what an attorney from the law firm, acting as

17  prosecutor, might say or present as evidence.  However, juror Hill had not at any time entrusted

18  her liberty to the fine skills of the prosecutor's law firm such that anyone associated with the firm

19  would be the recipient of Hills' undying gratitude and instant believability.  Nor, in any of Hill's

20  dealings with the partner of the prosecutor had Hill's financial assets been seriously in question.

21  Rather, Hill asked for advice on a couple of small claims court cases, and asked for advice on how

22  to obtain a public record.  It stretches credulity to believe that Hill would be seriously affected by

23  her relationship with the law firm.  Implied bias will only be found in *extreme* and *exceptional*

24  circumstances, Fields, 309 F.3d at 1104, such that an average person in the place of the juror

25  would be prejudiced.  United States v. Powell, 226 F.3d 1181, 1188 (10th Cir. 2000).  Put simply,

26  Juror Hill's relationship, not with the prosecutor, but with the prosecutor's law firm, for

1   exceedingly mundane matters, cannot even approach a prejudice situation characterized as

2   extreme or exceptional.  See also above cited authority discussing implied bias.

3           But, petitioner argues that Juror Hill's deception and concealment bespeaks an

4   actual bias.  The undisputed facts do not bear out such an unfair accusation.  The first colloquy

5   pointed to by petitioner involves the judge's initial "relationship" questions.  The question was

6   garbled, confusing and could well have been misunderstood by the average person who would not

7   be privy to the attorney professional conflicts standard that any lawyer in a firm may be deemed as

8   having represented the client if the client has a attorney-client relationship with any lawyer in the

9   firm.  First the judge confusingly used both the present and past tense in the relationship question

10  ("was" and "is.").  Then the judge initially focused only upon the prosecutor himself before

11  expanding the question.  Juror Hill's confusion – not deception – literally leaps off the pages of

12  the transcript, when she explained that she was thinking only about her attorney-client relationship

13  with an "associate" of the prosecutor.

14          The second situation involving Juror Hill and her attorney Rollston is concededly

15  more problematic, but still falls short of any actionable deception.  Perhaps being misadvised by

16  the judge when he initially, quickly dismissed any problem with Juror Hill having been a client of

17  attorney Rollston,[5] Juror Hill did again contact Rollston during the course of trial.  The colloquy

18  when this fact was ascertained is worth repeating because it does not unequivocally demonstrate

19  any deception:

20          The Court: Counsel brought up an issue or a question about whether
            you had contacted the firm that Mr. Rasmussen is with?
21          Juror Hill: That Mr. Who is with?
            The Court: Rasmussen.
22          Juror Hill:  No.
            The Court: Mr Rasmussen, did you–
23          Mr. Rasmussen: Did you call Ken Ralston (sic)?
            Juror Hill: Yes.

24

25

26          [5] "But they're not representing you now in any event?  Okay.  Thank you very much."

1    At best for petitioner, perhaps Juror Hill finally "got it" concerning the

2   inadvisability of any contact with the prosecutor's law firm when called in by the court, and in a

3   moment of embarrassment, initially misrepresented her contact with the law firm (which was then

4   rectified with the next question).  However, "[a]s this court has recognized, jurors may

5   sometimes...bend the truth a bit to avoid embarrassment."  Fields, 309 F.3d at 1104.  Viewing the

6   facts (reasonably) in favor of petitioner, the situation in petitioner's case can be no more than this.

7   The contact was on a very unimportant matter – a bit of advice on how to procure a public record

8   – a matter so trivial that no charge was made by the attorney.  While lying on a matter of

9   significance to the criminal case, e.g., personal knowledge of the defendant, or having been

10  victimized in a crime in similar ways to the case at issue, see e.g., Dyer v. Calderon, 151 F.3d 970

11  (9th Cir. 1998) (en banc), may bespeak a bias of wanting to be on the jury too much (so as to inure

12  to the detriment of the defendant), the de minimis contact here was so unrelated to the case that no

13  prejudice can reasonably be presumed.[6]

14          *Conclusion*

15          For the reasons discussed above, the court finds that petitioner has failed to

16  establish either prong of the Strickland analysis, i.e., that counsel acted unreasonably, or in any

17  event, that prejudice was established.  Because petitioner did not receive ineffective assistance of

18  counsel, this claim should be denied.

19  V.  Ineffective Assistance of Appellate Counsel

20          A claim of ineffective assistance of appellate counsel utilizes the same Strickland

21  standard that is applied to trial counsel.  Smith v. Robbins, 528 U.S. 259, 287, 120 S. Ct. 746, 765

22  (2000).

23  \\\\\

24  _____

25      [6] Also, there exists no authority for petitioner's proposition that one misrepresentation
    equals presumed bias.  The situation here, where, at most, Juror Hill made one tangential
    misrepresentation, is a far cry from the situation in Green v. White, 232 F.3d 671 (9th Cir. 2000)
26  where the juror engaged in a *pattern* of lies about his disqualifying criminal history.

1    Petitioner's third claim alleges that appellate counsel provided ineffective

2  assistance by: (1) failing to raise the ineffective of counsel claim issue alleged in claim 2 on

3  appeal, (2) failing to secure a complete trial transcript, including voir dire, and (3) refusing to

4  assist in identifying issues to include in his habeas petition.  All of these issues relate to the

5  presence of Juror Hill on petitioner's jury.

6    In reviewing ineffective assistance of counsel claims, California courts apply the

7  Strickland standard discussed above.  See In re Prescott, ___ Cal. Rptr. 3d ___, 2007 WL 968135

8  (April 3, 2007).  Accordingly, for the reasons discussed above, the court finds that had appellate

9  counsel raised the ineffective assistance of counsel claim on appeal it would have been denied.

10  For this reason, this claim should be denied.

11  VI.  Allen Testimony

12    Petitioner argues that he was denied due process because the testimony of Randy

13  Allen, the key prosecution witness, was tainted by her involuntary confession, induced by

14  promises of leniency and obtained in violation of Miranda.  The background to this claim is

15  contained in the opinion of the California Court of Appeal:

16    Randi Allen was interviewed by law enforcement officers on November 16, 17,
     and in December 1993, while in custody and represented by counsel. [Footnote
17    omitted.] On April 29, 1994, Allen entered into the immunity agreement whereby
     in exchange for her truthful testimony the charges against her would be dismissed.
18    Following a hearing regarding the interview of November 16, defendant moved to
     exclude her statements of November 16 and 17 and the one made in December as
19    well as her anticipated trial testimony.  The trial court granted the motion to
     exclude her statements to the police because they were hearsay, but denied the
20    motion as to her anticipated testimony.  Defendant claims the denial was error.  We
     disagree.
21
     At the hearing Attorney Jerry Cooper testified he had been appointed to represent
22    Allen in October 1993. [Footnote omitted.] On November 14 Cooper visited Allen
     in Nevada County and provided her with copies of approximately 500 pages of
23    discovery for her to peruse before they continued discussing her case.  Cooper
     advised Allen not to speak with anyone about her case other than himself.
24
     Contrary to Cooper's admonishment, Allen discussed the matter with her cellmate.
25    On November 15, with her cellmate's assistance, Allen filled out an inmate request
     form seeking an interview with the investigating officers.  On November 16, Allen
26    was interviewed by Officers Steven Eich, David Marshal, and Ed Leonard.  Allen

27

was advised of her <u>Miranda</u> rights and signed a form waiving them. [Footnote omitted.] When the officers told her they wanted to record the interview, Allen requested that her attorney be called.  She was concerned her words might be twisted and used against her, and she wanted to be considered a witness rather than a suspect.

Beginning around 11:30 a.m., Eich attempted to contact Cooper.  Eich telephoned his own office in Downieville to find out if Cooper was at the Downieville jail; Cooper was not in Downieville.  Eich left a message with Cooper's answering service to call Eich at the Nevada County jail.  Pursuant to a request by Eich, a corrections officer at the jail left a second message with Cooper's exchange to contact the officers when Cooper got in. After lunch Eich informed Allen they were unable to contact Cooper and asked her what she wanted to do.  She replied she wanted to continue without her attorney being present.

Prior to Allen giving her statement, the officers told Allen that if she told the truth and passed the polygraph test and was not implicated in the murder, they would recommend to the "D.A." that the charges against her be dismissed.  Allen was specifically advised the prosecutor would not be bound by their recommendation. Allen was very concerned about the charges and wanted out of jail because she had been informed that her daughter had been molested by her estranged husband. However, she wanted the truth to come out, so she told the officers, "Okay, just go ahead and tape it."  They did.

During the interviews of November 17 and in December Allen's counsel was present. The trial court concluded Allen's statement of November 16 was not coerced or involuntary, and that her subsequent statements made in the presence of her counsel were independent of the November 16 statement.

Defendant argues the record establishes that Allen's statement of November 16 was coerced, that her subsequent two statements were the "tainted" products of the November 16 statement, and that her trial testimony was the product of all three involuntary statements.  We disagree.

While a defendant has no standing to complain of Fifth or Sixth Amendment rights violations of a third party (<u>People v. Badgett</u> (1995) 10 Cal.4th 330, 343), a defendant does have standing to challenge the admissibility of a third party's testimony where it violates the defendant's due process rights.  (<u>Id.</u> at pp. 344-345.) However, "Testimony of third parties that is offered at trial should not be subject to exclusion unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony....Thus, it is not enough for a defendant who seeks to exclude trial testimony of a third party to allege that coercion was applied against the third party, producing an involuntary statement before trial.  In order to state a claim of violation of his *own* due process rights, a defendant must also allege [and prove] that the pretrial coercion was such that it would actually affect the reliability of the evidence to be presented at trial."  (<u>Id.</u> at 348, fn. omitted, italics in original; <u>People v. Douglas</u> (1990) 50 Cal.3d 468-500-501.)

Defendant argues Allen's statement of November 16 was coerced because 1) she was in custody, 2) she was charged with serious crimes, 3) she accepted advice from her cellmate, 4) the offenses against her were increased following the

28

1  preliminary examination, 5) she was concerned for her child, 6) they were unlawful
   police inducements, and 7) her <u>Miranda</u> rights were violated.  However, the only
2  circumstances argued to the trial court in support of the motion were that Allen
   was denied the right to have her attorney present, that her statement was made in
3  expectation she would be released from custody, and that her statement was given
   because she was concerned about her daughter who had reportedly been molested.
4  As previously noted (see fn. 2) the motions are reviewed only on the grounds urged
   in the trial court.  Consequently we determine the propriety of the motion only
5  upon the facts and arguments made in the lower court.

6  Defendant bears the burden of proving, by a preponderance of the evidence, that
   Allen's statements were involuntary.  (<u>People v. Douglas</u>, <u>supra</u>, 50 Cal.3d at p.
7  500.)  In determining the appropriateness of the trial court's determination, the
   reviewing court looks at the totality of the circumstances presented to the trial
8  court.  (<u>People v. Badgett</u>, <u>supra</u>, 10 Cal.4th at pp. 350-352.)

9  Here, it was Allen who first contacted the officers about giving a statement.  Allen
   testified that when she requested an attorney, the officers ceased questioning her
10 and attempted to contact her counsel.  When, approximately two and one-half
   hours later, the officers were unable to contact her counsel, they so informed her
11 and asked her what she wanted to do. Allen stated she wanted to give her
   statement.  Allen testified she was aware of her right to have her counsel present,
12 she did not feel she was being offered leniency in exchange for her statement, and
   no guarantees were given her in return for her statement.  Although Allen wanted
13 out of jail and was concerned about her child, she just wanted to tell the truth.

14 With respect to the officers' offer to recommend the charges against Allen be
   dismissed if she told them the truth and was not involved in the murder, the
15 California Supreme Court has observed: "All immunized witnesses are offered
   some quid pro quo, usually an offer of leniency.  We have never held, nor has any
16 authority been offered in support of the proposition, that an offer of leniency in
   return for cooperation with the police renders a third party statement involuntary or
17 eventual trial testimony coerced."  (<u>People v. Badgett</u>, <u>supra</u>, 10 Cal.4th at p. 354.)

18 Thus, given Allen's having initially contacted the officers, the officers' attempts to
   contact Allen's attorney at her request, her subsequent statement that she wished to
19 give them a tape recorded statement without her attorney being present, and her
   testimony that her statement was given voluntarily, we must conclude, as did the
20 trial court, that her statement of November 16 was not coerced.

21 Since we have found that Allen's statement of November 16 was not coerced, it
   follows that the subsequent statement which were given in her counsel's presence,
22 could not have been the product of non-existent coercion.

23 Answer, Exhibit A, pp. 4-9.

24        Illegally obtained confessions may be less reliable than voluntary ones, and thus

25 using a coerced confession at another's trial can violate due process.  <u>Douglas v. Woodford</u>, 316

26 F.3d 1079, 1092 (9th Cir. 2003).  Because Allen's statements themselves were not introduced at

1    petitioner's trial, petitioner must show that her trial testimony was involuntary.  Id., citing United

2    States v. Mattison, 437 F.2d 84, 85 (9th Cir. 1970).

3            Petitioner argues that because Allen's pretrial statements were involuntary and

4    inadmissible, her trial testimony was also inadmissible as the "fruit of the involuntary statements."

5    Amended Petition, p. 9: 4-6.  As discussed above, the California Court of Appeal found that

6    Allen's pretrial statements were not illegally obtained.  Based on this reasoning, this court finds

7    that Allen's trial testimony was voluntary.

8            In Mattison, the defendant also argued that the witness's trial testimony was so

9    tainted by the illegal confession that it rendered the trial fundamentally unfair.  437 F.2d at 85.

10   The Ninth Circuit disagreed, stating that "[B]y the time of trial, the psychologically coercive

11   atmosphere of that interrogation must surely have dissipated.  There is no indication that [the

12   witness] was told at any time by anyone what he should say on the witness stand."  Id.  The Ninth

13   Circuit also noted that, in contrast to introducing an out-of-court statement, the witness's

14   testimony was subject to cross-examination and the jury could observe demeanor and gauge

15   credibility and decide what weight to afford the testimony.  Id.

16           In the instant case, there is no claim that any of the circumstances which allegedly

17   rendered Allen's pretrial statements coerced still existed at the time of trial, where she was subject

18   to cross-examination.  Her pretrial statements were also excluded at trial.  "Having negotiated

19   complete immunity, the prosecution had nothing to hold over [Allen] at the time [she] testified."

20   Id. at 1093.  She was not told what to say at the trial other than to "tell the truth."  Id.  On these

21   facts, even were the court to find that Allen's pretrial statements were coerced, it would find that

22   her trial testimony was voluntary and did not violate petitioner's due process rights.

23           The California Court of Appeal was the last state court to issue a reasoned opinion

24   addressing this claim.  Answer, Exhibits A, B and C.  Because the denial of this claim by the

25   California Court of Appeal was not an unreasonable application of clearly established Supreme

26   Court authority, this claim should be denied.

VII.  <u>Immunity Agreement</u>

         Petitioner argues that he was denied his right to due process because the testimony of Allen was compelled by the use of a coercive "truthful" immunity agreement.  In <u>Gallego v. McDaniel</u>, 124 F.3d 1065 (9th Cir. 1997) the Ninth Circuit held that truthful immunity agreements do not violate due process.

         The California Court of Appeal was the last state court to issue a reasoned opinion addressing this claim.  Answer, Exhibits A, B and C.  Because the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority, this claim should be denied.

         Accordingly, IT IS HEREBY RECOMMENDED that the remaining claims be denied, i.e. claims 2, 3 (to the extent it alleges ineffective assistance of appellate counsel based on appellate counsel's failure to raise claim 2), 4 and 5, and that the petition be denied in its entirety. Judgment should be entered in favor of respondents.

         These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 5/23/07

                                        /s/ Gregory G. Hollows
                                        _____
                                        UNITED STATES MAGISTRATE JUDGE

corj18.157